UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CHRISTOPHER D. GRIFFITH,<br><br>                    Petitioner,<br><br>v.<br><br>RANDY BLADES,<br><br>                    Respondent. | Case No. 1:14-cv-00149-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court in this habeas corpus matter filed by Petitioner Christopher D. Griffith are several motions filed by the parties, including Respondent's Motion for Summary Dismissal based on procedural grounds. All parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case in accordance with 28 U.S.C. § 636(c). (Dkt. 12.)

The Court takes judicial notice of the records from Petitioner's state court proceedings, which have been lodged by the parties. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006). Having carefully reviewed the record, including the state court record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that oral argument is

**MEMORANDUM DECISION AND ORDER - 1**

unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order.

## PETITIONER'S MOTION TO ALLOW SUPPLEMENTAL PLEADING

Petitioner filed a "Motion to Allow Supplemental Pleading" (Dkt. 20), which appears to have crossed in the mail with Respondent's Motion for Summary Dismissal. Thus, Respondent has not had opportunity to include a response to the new Supplement. Nevertheless, to the extent that the new Supplement addresses procedural issues, the Court has considered it. To the extent that the Supplement contains argument on the merits of Petitioner's claims, the filing is premature. Therefore, the Court will grant in part and deny in part the motion.

## PETITIONER'S MOTION FOR APPOINTMENT OF COUNSEL

Petitioner has filed a Motion for Appointment of Counsel. (Dkt. 34.) There is no constitutional right to counsel in a habeas corpus action. *Coleman v. Thompson,* 501 U.S. 722, 755 (1991). A habeas petitioner has a right to counsel, as provided by rule, if counsel is necessary for effective discovery or if an evidentiary hearing is required in his case. *See* Rules 6(a) & 8(c) of the Rules Governing Section 2254 Cases. In addition, the Court may exercise its discretion to appoint counsel for an indigent petitioner in any case where required by the interests of justice. 28 U.S.C. § 2254(h); 18 U.S.C. § 3006A(a)(2)(B). Whether counsel should be appointed turns on a petitioner's ability to articulate his claims in light of the complexity of the legal issues and his likelihood of success on the merits. *See Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983).

Petitioner is correct that the Court should and would appoint counsel for him if an evidentiary hearing was required under *Martinez v. Ryan*, 566 U.S. 1 (2012). However, the threshold issue in this case is whether the Petition in this matter has been timely filed. Because the timeliness issue is straightforward, the Court concludes that appointing counsel to aid Petitioner with the timeliness issue is not necessary. Presently, neither discovery nor an evidentiary hearing is needed. Therefore, Petitioner has not met the standards for appointment of counsel, and the motion will be denied.

## RESPONDENT'S MOTION TO DISMISS THE PETITION

### 1.    Standard of Law

When a petitioner's compliance with threshold procedural requirements is at issue, a respondent may file a motion for summary dismissal, rather than an answer. *White v. Lewis*, 874 F.2d 599, 602 (9th Cir. 1989). Rule 4 of the Rules Governing § 2254 Cases authorizes the Court to summarily dismiss a petition for writ of habeas corpus when "it plainly appears from the face of the petition and any attached exhibits that the petitioner is not entitled to relief in the district court."

The Antiterrorism and Effective Death Penalty Act (AEDPA) requires a petitioner to seek federal habeas corpus relief within one year from several triggering events set forth in the statute. 28 U.S.C. § 2244(d)(1)(A)-(D). Two of those triggers are at issue in this case—subsections (A) and (D).

Subsection (A) provides that the one-year statute of limitations is measured from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). One year

means 366 days, for example, from January 1, 2000, to January 1, 2001. *See Patterson v. Stewart*, 251 F.3d 1243, 1246 (9th Cir. 2001) (applying Federal Rule of Civil Procedure 6(a) to AEDPA).

Under 28 U.S.C. § 2244(d)(1)(A), the date of "finality" that begins the one-year time period is marked as follows, depending on how far a petitioner pursues his claim:

| Action Taken | Finality Occurs |
|---|---|
| No appeal is filed after state district court order or judgment | 42 days later, *see* Idaho Appellate Rule 14 |
| Appeal is filed and Idaho Court of Appeals issues a decision, but no petition for review is filed with the Idaho Supreme Court | 21 days later, *see* Idaho Appellate Rule 118 |
| Appeal is filed and Idaho Supreme Court issues a decision or denies a petition for review of an Idaho Court of Appeals decision, and Petitioner does not file a petition for writ of certiorari with the United States Supreme Court | 90 days later, *see* United States Supreme Court Rule 13 |
| After Idaho Supreme Court issues a decision or denies a petition for review, Petitioner files a petition for writ of certiorari to the United States Supreme Court, and the petition is denied | Date of denial |
| After Idaho Supreme Court issues a decision or denies a petition for review, Petitioner files a petition for writ of certiorari to the United States Supreme Court, the petition is granted, and the United States Supreme Court issues a decision | Date of decision |

In each instance above, "finality" is measured from entry of the final judgment or order, not from a remittitur or mandate, which are mere formalities. *Gonzales v. Thaler*, 132 S.Ct. 641, 653 (2012); *Clay v. United States*, 537 U.S. 522, 529 (2003); *Wixom v. Washington*, 264 F.3d 894, 898 n.4 (9th Cir. 2001).

**MEMORANDUM DECISION AND ORDER - 4**

Subsection (D) provides that the statute runs from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(d). To clarify, "[t]ime begins when the prisoner knows (or through diligence could discover) the important facts, not when the prisoner recognizes their legal significance." *Hasan v. Galaza*, 254 F.3d 1150, 1154 (9th Cir. 2001) (citing *Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000)).

AEDPA also contains a tolling provision that stops or suspends the one-year limitations period from running during the time in "which a properly filed application for State postconviction or other collateral review . . . is pending." 28 U.S.C. § 2244(d)(2). Because this particular statutory provision applies only to "pending" actions, the additional 21-, 42- and 90-day time periods associated with the calculation of finality after direct appeal are *not* applied to extend the tolling periods for post-conviction actions. However, unlike direct appeal "finality," the term "pending" *does* extend through the date of the remittitur.[1]

The federal statute is *not* tolled between the date the direct appeal is "final" and the filing of a proper post-conviction application, or between post-conviction finality and any successive collateral review petition. *Id.* Each time statutory tolling ends, the statute of limitations does not restart at one year, but begins running at the place where it stopped before the post-conviction action was filed.

---

[1]     *See Lawrence v. Florida*, 549 U.S. 327, 337 (2007). "Pending" is determined according to each particular state's law. In Idaho, an appellate case remains pending until a remittitur is issued. *See Cochran v. State*, 133 Idaho 205, 206, 984 P.2d 128, 129 (Idaho Ct. App. 1999).

Once a federal statute of limitations has expired, it cannot be reinstated or resurrected by a later-filed state court action. *See Ferguson v. Palmateer*, 321 F.3d 820, 822 (9th Cir. 2003) ("section 2244(d) does not permit the reinitiation of the limitations period that has ended before the state petition was filed").

## 2.    Background

Petitioner was convicted of the first degree murder of two-year-old Tegan Rees in November of 2002. He was sentenced to life indeterminate, with a fixed term of 22 years to be served prior to parole eligibility.

After conviction, Petitioner filed a direct appeal. The Idaho Court of Appeals affirmed Petitioner's conviction and sentence. The Idaho Supreme Court denied the petition for review on July 11, 2007. (State's Lodgings B-1 to B-10.) Petitioner did not file a petition for a writ of certiorari with the United States Supreme Court, and the judgment became final 90 days later, on October 9, 2007.

On July 8, 2008, Petitioner, through counsel, filed a first post-conviction petition in the state district court. The petition was dismissed by a court order signed on September 18, 2009, and docketed on September 22, 2009. Petitioner did not file an appeal. (State's Lodgings C-1 to C-30.)

On March 18, 2013, Petitioner filed a successive post-conviction petition. The petition was dismissed because it was untimely and barred by the successive petitions prohibition of I.C. § 19-4908. That decision was affirmed on appeal by the Idaho Court of Appeals on May 11, 2015. Petitioner filed a late petition for review, which ultimately was rejected by the Idaho Supreme Court. (State's Lodgings E-1 to E-15.)

During the appeal of the successive post-conviction action, on February 3, 2014, Petitioner filed a Rule 35 motion to correct an illegal sentence, which was denied by the state district court. The Idaho Court of Appeals affirmed the denial of the motion on October 20, 2014. Petitioner did not file a petition for review, and the remittitur was issued on November 12, 2014.

Petitioner filed his federal Petition for Writ of Habeas Corpus in this action on April 14, 2014 (mailbox rule). Because his successive post-conviction appeal was still pending in state court, this action was stayed between August 2014 and August 2016. (Dkts. 5, 9.) This case was re-opened upon completion of the state court matter.

3.    **Discussion of Timeliness Issue**

Petitioner's petition for review on direct appeal was denied by the Idaho Supreme Court on July 11, 2007. Petitioner's federal statute of limitations period began on October 9, 2007, which marked the conclusion of the 90-day period during which Petitioner could have filed a petition for writ of certiorari with the United States Supreme Court. Because Petitioner waited so long to file his first post-conviction petition, until July 8, 2008, a total of 272 days of the federal statute of limitations period elapsed before tolling suspended the running of the statute with 94 days remaining (366 – 272 = 94).

The federal statute of limitations began running again when Petitioner's post-conviction case was dismissed by the state district court, on September 22, 2009. "Pending" does not include the time during which a notice of appeal could have been filed—that extension applies only to direct appeal. "Pending" *does* include the time period through the issuance of an appellate court's remittitur if an appeal is filed.

However, Petitioner did not file an appeal, and so there was no additional time during which his post-conviction action was "pending" beyond the district court's order of dismissal.

The remaining 94 days of the federal statute of limitations expired on Friday, December 25, 2009, or, more precisely, the next business day thereafter, December 28, 2009, well before Petitioner filed his successive post-conviction action on March 18, 2013. The late filing of a state post-conviction action cannot resurrect a federal limitations period that has already expired. Therefore, Petitioner's federal petition, filed in 2014, was untimely by several years.

Arguing that his statute of limitations should run from "the date on which the factual predicate of the claim … could have been discovered through the exercise of due diligence" under § 2244(d)(1)(d), Petitioner asserts that his federal statute of limitations did not begin to run until he had obtained an affidavit from Mr. Scott Lee Hill, because previously only Petitioner's counsel knew the "exact contents" of Mr. Hill's potential trial testimony. Petitioner states that his counsel told him conflicting things at the time of trial—that Mr. Hill's story both helped and hurt Petitioner's defense—and it was not until 2013 that Petitioner discovered that Mr. Hill's testimony would have been "very helpful" to Petitioner's defense. (Dkt. 20-1).

This argument is not persuasive. At the time of trial, Petitioner knew that his counsel had given him conflicting advice about Mr. Hill's potential testimony. Petitioner could have obtained clarification from counsel or from Mr. Hill, who was an

acquaintance of Petitioner, about which version was correct. This set of circumstances does not qualify for a later start date of the statute of limitations under § 2244(d)(1)(D).

4.    **Equitable Tolling**

   A.    *Standard of Law*

   If a petition is deemed untimely, a federal court can hear the claims if the petitioner can establish that "equitable tolling" should be applied. In *Pace v. DiGuglielmo*, the Supreme Court clarified that, "[g]enerally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way." 544 U.S. 408, 418 (2005). In addition, there must be a causal link between the lateness and the extraordinary circumstances. *See Bryant v. Schriro*, 499 F.3d 1056, 1061 (9th Cir. 2007) (holding that a petitioner must show that his untimeliness was caused by an external impediment and not by his own lack of diligence). The petitioner bears the burden of bringing forward facts to establish a basis for equitable tolling. *United States v. Marolf*, 173 F.3d 1213, 1318, n. 3 (9th Cir. 1999).

   B.    *Discussion of Equitable Tolling Issue*

   Petitioner asserts that equitable tolling should be applied to excuse the untimeliness of his federal petition, because the Idaho Department of Correction has an official policy of not providing any case law to inmates. Particularly, Petitioner asserts that the cases of *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Lafler v. Cooper*, 566 U.S. 156 (2012), were never made available to Petitioner in the prison legal resource center.

However, these cases have nothing to do with the timeliness issue. Both cases were issued in 2012, several years after Petitioner's statute of limitations expired in 2009.

In the alternative to his argument that his statute should not have begun until 2013 when he discovered the true testimony of Scott Hill, Petitioner argues that equitable tolling should be applied for all of the time prior to this discovery. However, Petitioner has not shown that he exercised diligence in trying to determine Mr. Hill's potential testimony.

Petitioner was aware that Mr. Hill came to his home and observed Breanna Mills, Tegan's sister; Tegan; and Petitioner shortly before Tegan died. Petitioner's defense theory was that the Breanna played roughly with Tegan and jumped or fell on him, knees first, such that it caused the severe spleen injury that led to Tegan's death. Mr. Hill would have testified that he saw Breanna jumping from one piece of furniture to the other toward Tegan, just hours before the incident. Other trial witnesses testified that, during the same general time period, Breanna liked to pretend she was a "Power Puff Girl" who could fly, and she often would jump off furniture. Petitioner's expert witness testified that a blow from Breanna's knees could have caused the injury.

Because Petitioner knew that Mr. Hill could have had some information about Breanna's behavior on the day in question, and because Petitioner knew that his attorney had told Petitioner conflicting stories of what Mr. Hill might say, Petitioner did not act with diligence when he failed to investigate Mr. Hill's story immediately. Petitioner does not qualify for equitable tolling because he has not shown that he was diligent or that "extraordinary circumstances beyond his control … made it impossible for him to file his

§ 2254 federal habeas corpus petition in the district court on time." *White v. Klitzkie*, 281 F.3d 920, 925 (9th Cir. 2002).

5.    **Actual Innocence**

*A.  Standard of Law*

The United States Supreme Court has determined that there is an "actual innocence" exception to the AEDPA statute of limitations, and that the exception applies where a petitioner meets the rigorous actual innocence standard of *Schlup v. Delo*, 513 U.S. 298 (1995). *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928 (2013). "'Actual innocence means factual innocence, and not mere legal insufficiency.'" *Marrero v. Ives*, 682 F.3d 1190 (9th Cir. 2012) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

To make a showing of actual innocence under *Schlup*, a Petitioner must present new evidence showing that "'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *Perkins*, 133 S.Ct. at 1933 (quoting *Schlup*, 513 U.S. at 329). This exception is to be applied only in the "extraordinary" or "extremely rare" case. *House v. Bell*, 547 U.S. 518, 538 (2006); *Schlup*, 513 U.S. at 320-21.

*B.      Discussion of Actual Innocence*

Petitioner asserted his actual innocence at sentencing, and continues to assert his actual innocence in this action. To assess his claim, the Court reviews the evidence presented at trial, together with additional evidence the jury did not hear.

Breanna Mills, who was four at the time of the incident and five at the time of the trial, testified that she was outside when Tegan got hurt, but came inside because she

heard Tegan crying from being spanked. She testified that Petitioner told her, "Don't tell anyone." (State's Lodging A-6, p. 644-45.) She reaffirmed at trial that she told someone she heard things falling in the house, and identified LeAnn Shaw as one of the people she told. (*Id.*, p. 646.)

LeAnn Shaw testified that she had been an Idaho Department of Health and Welfare employee doing child case management and child abuse investigations for 12 years and then working with foster care and adoption for 6 to 7 years. Shaw testified that, on the way to Breanna's foster care home on the day of the incident, Breanna told her:

> [M]y brother got dead—my brother is at the hospital. My brother got dead. He closed his eyes and got dead. Chris spanked him hard. My brother messed his pants. Chris is mean and has big muscles. Chris spanked him hard, and she clapped her hands [and] said, it sounded like this. And then … she said, I could hear things fall in the bathroom.

(State's Lodging A-5, p. 409.)

Officer Brad Miller testified that Tegan was gray in appearance when Miller arrived at the scene, and Tegan appeared to be dead. Miller noted a dollar-size bruise on the left side of Tegan's jaw. Upon hearing Miller's report of the scene, Miller's supervisor gave instructions to control the apartment as a crime scene. (State's Lodging A-5, pp. 4-15.)

Drew Shaltry, a responding EMT/firefighter, testified that he asked what happened, and Petitioner had said that the child had been eating cereal and choked. (State's Lodging A-5, p. 40.) At the hospital, Shaltry noted two bruises of dime or quarter size on the left chest. (*Id.*, p. 79.)

Ray Vienello, a responding EMT/fire fighter, also testified that Petitioner had said Tegan was eating cereal, had choked, and another child had come to him and said there was a problem with Tegan. (State's Lodging A-5, p. 123.) John Tenerowicz, an EMT/firefighter testified that he noticed "a number of mottled pattern of bruises on [Tegan's] abdomen, his chest, and there were some on the facial region, also." (*Id.*, p. 150.) He said the pattern of some of the bruises looked like fingerprints. (*Id.*, p. 151.)

Chris Reed of the Bonneville County Sheriff's Office interviewed Petitioner after Tegan died. Petitioner said that he had changed the child's diaper, and then the child was playing in the other room with his sister. "They were happy; they were playing; there were no unusual noises, anything that concerned or alarmed him." (*Id.*, pp. 220-21.) Petitioner said Tegan did not appear to be sick. Petitioner said he first became aware that Tegan was hurt when the sister came into the bedroom and told him that Tegan was going to sleep and wasn't breathing." (*Id.*, p. 221.)

Detective James Foster testified that he found a soiled diaper in the master bedroom and one in the bathroom, a baggie of cereal in the living room, and cereal in the master bedroom. (*Id.*, p. 245-56.) Foster also took photographs of Tegan's body. (*Id.*, p. 261-64.)

Two police interviews of Petitioner placed into evidence. (*Id.*, p. 271-72; State's Lodging B-7.) "In both, [Petitioner] stated that Tegan was fine and without bruises when [he] changed his diaper." (State's Lodging B-7, p. 17.) Amy Kimmel, the 911 dispatcher, testified that Petitioner said, "he [is] turning blue," and "I killed him." (State's Lodging A-5, p. 318.)

Melissa Rees Mills, Tegan's mother, testified that Petitioner and she were alone in a room at the hospital and he was "rocking back and forth and saying he was going to jail." (State's Lodging A-5, p. 348.) She testified she bathed the child a few hours before his death and he had only two older yellowing bruises on his face. (*Id.*, pp. 350-51.) Mills testified that she told Detective Foster that Tegan was Vitamin K deficient and bruised easily. At trial, she explained that she meant he broke out in spots, like a rash, "when you would push on his skin [the spots would] go white and then red." (*Id.*, pp. 358-59.) She testified that her landlord wouldn't let her add Petitioner to her lease because he "had a bad temper and had some run-ins with her." (*Id.*, pp. 36-62.)

Jessica Adam, a neighbor, gave Tegan's mom a ride to work, and then returned to Tegan's apartment. She saw the children, and noticed nothing unusual about Tegan's condition at that point. About 20 or 25 minutes later, she saw Tegan being carried to the ambulance; he was really pale and had a bluish color to him. (*Id.*, pp. 394-96.)

Dr. Lori D. Frasier, an associate professor of pediatrics at the University of Utah School of Medicine, testified that "the number and the multiplicity and location of contusions on Tegan's body were not consistent with any potential accidental mechanism. [T]hese were all inflicted nonaccidental trauma abusive injuries." (State's Lodging A-6, p. 680.) She also testified that an injury to the pancreas is "pretty rare … because the pancreas is extremely well-protected … [I]t's behind the other organs." (*Id.*.) She further testified that the blow to the pancreas had to come from an angle to damage the pancreas, because the liver, stomach, and transverse part of the duodenum were not contused. (*Id.*., pp. 682-83.)

**MEMORANDUM DECISION AND ORDER - 14**

Linda Taylor, the children's daycare provider, testified about her general observations of the children. Taylor did not ever see Breanna injure Tegan, and Taylor noticed that, in the past, Tegan had not been bruised even after running into a wall and falling off a swing face-first. (State's Lodging A-6, pp. 699-706.) She did see a bruise on his forehead on November 5, 2001, the day before Tegan's death, but saw no bruises on the rest of his naked body. (*Id.*, p. 708.)

Teresa Covert, a neighbor, testified that, the weekend before Tegan died, she caught Breanna trying to jump off the couch onto Tegan, who was lying on the floor. (*Id.*, p. 862.) She further testified Tegan had a bruise on his forehead and received one on his back while in her care. (*Id.*, p. 863.) Teresa testified also that she was in the apartment beneath Tegan's apartment during the time period in question and heard no beating, crying, or other noises. (*Id.*, p. 867.)

Expert witness Saami Shaibani testified that he was a clinical professor with Temple University, and had been with Temple for ten years, depending on the job title. (*Id.*, p. 740.) His specialty is injury mechanisms analysis, which he defined as the study of physics, trauma, and engineering to determine whether an injury could have been caused by the circumstances involved. (*Id.*, pp. 741-42.) He has a bachelor's degree, two master's degrees, and a doctorate degree in materials physics—all from the University of Oxford; he also taught at that university for six years. (*Id.*, pp. 743-47.) He testified that he conducted accident-related injury mechanism analysis both at Oxford and at Temple University Medical School. (*Id.*, pp. 746-749.) He further testified that he had done extensive research in the pediatric field for five years. (*Id.*, p. 750.)

Dr. Shaibani testified that the injury to Tegan's pancreas occurred without any other collateral damage to the liver, to the ribs, or to the outer part of the body. He deduced that this meant "a very high force was applied very, very suddenly." (State's Lodging A-6, pp. 768-71.) In his opinion, the transection (or cut) in the pancreas was caused by coming into contact with the spinal column. (*Id.*, p. 777.) He testified that he was surprised that the liver was not injured. He said: "The physical evidence just isn't there as to how the blow was administered and how the child was oriented when the blow was administered." (*Id.*, p. 784.)

Dave Griffith, Petitioner's father, testified that he did not hear Petitioner say that he believed he was going to jail while they were together at the hospital. (*Id.*, p. 799.) Dave's wife, Jackie Griffith, did not hear her son make such a statement. (*Id.*, p. 768.) Jackie also testified that Breanna had a Power Puff Girl costume, and jumped off the couch and kitchen table and wanted to jump off Jackie's deck outside her house, about nine feet off the ground. (*Id.*, p. 821.)

Elizabeth Schoonover, a neighbor, testified that a few weeks before Tegan died, she witnessed Breanna jump from a chair onto Tegan, who was lying on the floor, landing with her feet on Tegan's thighs, which made Tegan cry. (*Id.*, p. 856-57.) She observed Scott Hill go into Tegan's apartment about 11:00 a.m. on the day of Tegan's death. (*Id.*, p. 853-55.)

Lora Summerville, a neighbor whose apartment kitchen and living room were adjacent to Tegan's kitchen and living room, did not hear any crying, spanking, or beating during the time period at issue. (*Id.*, pp. 832-35.) She testified that her bedrooms

and Tegan's apartment's bedrooms were the farthest rooms apart from each other, and that a television had been on in Tegan's apartment. (State's Lodging A-6, p. 848-49.) She could hear kids running around before the paramedics arrived. (*Id.*)

Summerville saw the paramedics working on Tegan because Tegan was not breathing, and she asked Petitioner what happened. She testified that "he just kept saying, I don't know; I don't know; I don't know." (*Id.*, p. 835.) She was at the hospital and did not hear Petitioner say he feared going to jail. (*Id.*, p. 839.) Summerville also had seen Breanna jump off the couch and chairs before the day of the incident; she saw Breanna jump over Tegan, but never on Tegan. (*Id.*, p. 843.)

Wade Christensen, a physician's assistant who treated Tegan during Tegan's life, testified that Tegan was treated for multiple ear infections, but that he was not treated for a blood disorder or a vitamin K deficiency. (*Id.*, pp. 968-71.)

Dr. Richard Reimann, a Boise State University physics professor, testified that he conducted various experiments to see whether a 35-pound weight dropped onto another person could sever the pancreas. He used a hog pancreas and hotdogs, which were about the same consistency as the hog pancreas, and found that they all could be severed from 35 pounds dropped from a one-foot height. (*Id.*, pp. 878-951.)

Dr. Shaibani was recalled as an expert witness to rebut Dr. Reimann's testimony. Dr. Shaibani testified that the materials Dr. Reimann used in his testing (a hot dog, a PVC pipe, and carpet padding) had never been used in other tests to simulate the human body. (*Id.*, pp. 973-79.) Dr. Shaibani testified that a human body is unlike a baseball bat used in Dr. Reimann's testing:

**MEMORANDUM DECISION AND ORDER - 17**

[Tegan's sister's] knee could not have weighed more than 2.4 pounds. Very light object, not the whole 35 pounds of her body, which is distributed everywhere else, in her head and in her chest and so on and so forth. The only part of her body where the knee is involved cannot have a mass of more than 2.4 pounds….

If you have a child falling from a height of 12 inches, and the knee lands on another child, as that knee lands, I can try and concentrate it and the knee may indeed stop or slow down. But guess what? The rest of the body is going to keep on moving. Thirty pounds is free to move here. Two-and-a-half pounds may stop there.

(State's Lodging A-6, pp. 985-86.) Dr. Shaibani testified that, while a greater mass of weight could be generated if a person artificially constrained her leg and then jumped, he found it "incredible" or "fantastic" that someone could land on a knee when falling from a height of 12 inches. (Id., pp. 1000-01.)

Dr. Jeffrey Stieglitz, the ER doctor who treated Tegan and pronounced his death, testified that, when Tegan arrived, "His face was swollen. He had some bruises along the left side of his face and his jaw, his neck. He had a bruise behind his right ear and a bruise on the front of his chest and to the left side of his chest. His stomach was distended; the skin was pale. He didn't have any pulse and he wasn't trying to breathe at all." (*Id.*, pp. 461-62.) The bruises looked fresh, other than an obviously older one on the left side of his face. (*Id.*, p. 468.)

Dr. Steve Skoumal, the autopsy doctor, testified that pancreas injuries are uncommon and are usually sustained in passengers in motor vehicle accidents and pedestrians struck by motor vehicles. (*Id.*, at 525–570.) He testified that blunt force trauma caused the pancreas to be pushed against the spine, causing the pancreas to tear

down the middle. (*Id.*, pp. 598-600.) Dr. Skoumal opined that the cause of death was nonaccidental trauma. (*Id.*, p. 609.)

As to evidence the jury did not hear, two other statements Breanna made the day after Tegan died were not admitted. Janet Liester, the foster mother, said that Breanna told her:

> Tegan pooped his pants, and Chris spanked him really, really hard. Chris spanks really hard. Then he was asleep on my bed and his eyes were closed. Then he was asleep by me and his eyes were closed. I think he's dead! (Said in a soft, scared tone.)

(State's Lodging A-1, p. 51.)

Health and Welfare worker Dannielle Hawkins interviewed Breanna, who told her: "'I heard Chris spank him.' 'Tegan, do you want a spanking.' 'Because he pooped in his diaper.'" (State's Lodgings A-1, p. 52.) While the jury did not hear these out-of-court statements (*see* State's Lodging B-7, p. 8, n. 2), the Court includes these two statements here, because it is possible that, on retrial, these additional statements might be admitted into evidence.[2]

Mr. Hill's Affidavit states:

> [A]t the time that I was at the home of Chris and Melissa, the two children, Breann and Teagun [sic] where [sic] in the living room. Teagun was attempting to watch cartoons and his sister Breanna was jumping from the couch towards Teagun, using the couch for a trampolin[e].

---

[2]    In *Bousley*, the Supreme Court explained that "the Government is not limited to the existing record to rebut any showing [of actual innocence] that petitioner might make. Rather, on remand, the Government should be permitted to present any admissible evidence of petitioner's guilt even if that evidence was not presented [at the earlier proceeding]." 523 U.S. at 624.

**MEMORANDUM DECISION AND ORDER - 19**

> Breanna was being so overly "rambunctious" and was so rowdy that Chris had to place her in a "time-out" in the next room as she was hurting her brother when she was jumping from the couch toward him as he was watching television.
>
> When Breanna was jumping from the couch towards her brother Teagun, she was doing so in such a manner that at one point in time I had to catch the television from falling and hitting Teagun, and Breanna had jumped into the television so hard that she had knocked it from its stand and if I had not caught it, it would have seriously hurt Teagun.
>
> I informed the attorney of all of this information, but he stated that it was not useful for Chris in his trial, and that I would not be called as a witness.

State's Lodging D-1, pp. 22-23.)

The jury did not hear that Dr. Shaibani, the State's physics expert, bolstered his credentials in an unrealistic and untrue manner. He testified that he was a clinical professor at Temple University, and that "[d]epending on the job title," he had been with Temple for ten years. (See State's Lodging B-7, p. 11.) In several other criminal cases from around the country, Dr. Shaibani's credentials were called into question; in at least one other case, his testimony was stricken because of his misrepresentations. (See State's Lodgings B-3, B-11.) Letters from Temple University's lawyer stated that Shaibani "was awarded a courtesy appointment as a Clinical Associate Professor . . . for the period September 1, 1995 through August 31, 1998," but that "[a]ny current representation that Mr. Shaibani is employed by or affiliated with Temple University is simply untrue." (State's Lodging B-11, p. 12.) Another letter from Edward Gawlinski, chair of the Temple Department of Physics, said any such current representation of a professorship at, or affiliation with, Temple University was fraudulent. (*Id.*, pp. 11-12.)

**MEMORANDUM DECISION AND ORDER - 20**

In response to Petitioner's request for a new trial, the Idaho Court of Appeals opined:

> [C]onsidering other evidence which heavily countered Griffith's theory that Tegan's injuries could have been inflicted by his young sister, we are convinced the verdict would not have been different if Shaibani had not testified at all."
>
> \* \* \*
>
> Viewed collectively, the evidence was overwhelmingly inconsistent with Griffith's defense theory that Tegan's fatal injury was caused by B.M. jumping or falling onto him. The theory does not explain how the multitude of fresh bruises would have been inflicted all over the child's body in a span of a few minutes, all while Griffith was in the next room but heard no fight or other commotion between the children.

(State's Lodging B-11, pp. 17-18.)

Petitioner's allegations regarding Dr. Shaibani's credentials technically do not meet the criteria for actual innocence—which is a focus on factual innocence. Petitioner contended only that Shaibani lied about his credentials; Petitioner did not challenge the substance of Shaibani's testimony—either as to facts or opinions. As the Idaho Court of Appeals noted, "It might legitimately be argued that if Shaibani had never testified about his alleged affiliation with Temple University, it would have had no effect on the verdict because Shaibani likely still would have been deemed qualified as an expert and permitted to present his opinion testimony." (State's Lodging B-7, p. 15.)

Having reviewed the totality of the evidence, the Court concludes that Petitioner has not made a persuasive case of actual innocence. Quite a few witnesses testified that Breanna often jumped off furniture near Tegan while she played; one testified she

jumped *on* him. Mr. Hill's testimony would have added only that she did so on that

particular day, several hours before Tegan was fatally injured. Neither Mr. Hill's

testimony or Dr. Shaibani's stretching of the truth about his credentials or lying about his

credentials would have addressed the critical question of how Tegan received so many

fresh bruises between the time Petitioner changed his diaper and the time Breanna

allegedly informed him that Tegan was not breathing—especially given that Petitioner

said he heard no crying or commotion coming from the children. Three adults who were

unrelated to the family (two of them being mental health professionals) were ready to

testify that Breanna had told them that Petitioner had hit Tegan for soiling his diaper.[3]

## 6.    Conclusion

The Petition for Writ of Habeas Corpus in this action was filed beyond the federal

statute of limitations period. Petitioner has not shown diligence or extraordinary

circumstances to qualify for the equitable tolling exception. Petitioner has not made an

actual innocence argument that is persuasive, given that the evidence showed not only a

severe pancreas injury caused by a strong and swift blow of unknown origin, but that the

child had been beaten sometime between the time the mother left home and the child was

found unconscious. Even though the pancreas injury could have been caused by either

Petitioner or Brianna, there are no facts or allegations showing that Breanna inflicted the

beating wounds, considering Petitioner's report that there was no commotion or crying

---

[3]        Admissible during the penalty phase, but not during the guilt phase, were several instances of battery-type incidents in Petitioner's past. (State's Lodging A-4.) For example, Petitioner had been physically abusive to Tegan's mother; he had a misdemeanor battery conviction on his criminal record; and, more recently, he had taken a man to the ground and hit him 10 to 15 more times while the man was down.

before he found Tegan unconscious. Accordingly, the Court will dismiss the Petition with prejudice. The Court does not reach Respondent's procedural default defense.

## ORDER

**IT IS ORDERED:**

1. Petitioner's Motion for Extension of Time to File Reply in Support of the *Martinez v. Ryan* Motion (Dkt. 31) is GRANTED.

2. Respondent's Motion for Leave to File Excessive Pages (Dkt. 27) is GRANTED.

3. Petitioner's Motion for an Evidentiary Hearing (Dkt. 35) is DENIED.

4. Petitioner's Motion to Allow Second Supplemental Pleading (Dkt. 20) is DENIED without prejudice.

5. Petitioner's Motion to Proceed under *Martinez v. Ryan* (Dkt. 26) is DENIED.

6. Respondent's Motion for Summary Dismissal (Dkt. 19) is GRANTED. The Petition (Dkt. 3) is DISMISSED with prejudice.

7. Petitioner's Motion for Appointment of Counsel (Dkt. 34) is DENIED.

8. The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward a copy of the notice of appeal, together with this Order, to the United States Court of Appeals for the Ninth Circuit. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.

DATED: August 16, 2017



_____
Honorable Candy W. Dale
United States Magistrate Judge